**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| ZIBALSTAR, L.C., a Utah Limited Liability Company, et al., <br><br>                 Plaintiffs, <br><br> vs. <br><br> ROBERT CONTE, an Individual; et al., <br><br>                 Defendants. | Civil Action No: 1:17-CV-00563-JNP |

## PLAINTIFFS' *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiffs, by and through their counsel of record, hereby submit the following Motion for Ex Parte Temporary Restraining Order and Preliminary Injunction. An emergency hearing is requested.

## I.  INTRODUCTION

As part of the scheme described in the Complaint, the Conte-Hansen Enterprise has mismanaged a series of Properties owned or leased by Plaintiffs, including by diverting the revenues from these Properties and thereby causing the failure to make associated mortgage and lease payments. When Plaintiffs became aware of this mismanagement, they terminated the Conte-Hansen Enterprise and their Agents from their management position at the Properties. However, in several instances the Conte-Hansen Agents have refused to leave, and resisted efforts to be removed from these Properties, including by convincing police that they had a legal right to continue "operating a business" on these Properties. Since police have refused to remove

the Conte-Hansen Agents, they have continued to assert control over these Properties while also selling the inventory and diverting the funds to themselves. In other instances the Conte-Hansen Agents initially left the Properties but later returned, not only trespassing but also damaging or converting personal property from the Properties. Plaintiffs bring this Motion seeking emergency injunctive relief from this Court in order to prevent the Conte-Hansen Agents from further trespass, damage, and conversion, and other harms caused thereby, on Plaintiffs' Properties.

## II.   STATEMENT OF PRECISE RELIEF SOUGHT

Plaintiffs seek a temporary restraining order and preliminary injunction to preserve the status quo by prohibiting the Conte-Hansen Enterprise and any officers, employees, members, agents, representatives, attorneys and assigns, as well as any persons who are in active concert with them from the coming onto or into the following properties:

A.    The gas station located at 400 S Main, Alpine, UT 84004 ("Alpine Station").

B.    The gas station located at 40 W 400 N, Fairview, UT 84629 ("Fairview Station").

C.    The gas station located at 3370 N Highway 20, Island Park, ID 83429 ("Island Park Station").

D.    The gas station located at 445 E Center St, Panguitch, UT 84759 ("Panguitch Station").

E.    The gas station located at 400 N 300 W, Scipio, UT 84656 ("Scipio Station").

F.    The gas station located at 1593 Zion Park Blvd., Springdale, UT 84767 ("Springdale Station").

G.    The residential apartment complex located at 1246 South Memorial Drive, Tulsa, OK 74112 ("The Cove").

H. The residential apartment complex located at 2140 S. 109th East, Tulsa, OK 74129 ("Bradford Townhomes").

I. The residential apartment complex located at 3400 SW 44th St, Oklahoma City, OK 73119 ("Southern Oaks").

J. The residential apartment complex located at 1140 South 101st East Ave, Tulsa, OK 74128 ("Whispering Oaks).

K. The residential apartment complex located at 6618 East Latimer Place, Tulsa, OK 74128 ("McKinley Court").

L. The residential apartment complex located at 5400 Boca Raton Blvd, Fort Worth, TX 76112 ("Tres Palms").

M. The residential apartment complex located at 2507 South 87th East Ave, Tulsa, OK 74129 ("Silverwood").

N. The residential apartment complex located at 2523 East 10th St, Tulsa, OK 74104 ("Four Oaks").

O. The residential apartment complex located at 880 Jackpot Ave, Jackpot, NV ("San Jacinto").

P. The residential apartment complex located at 5925 Callaston Lane, Fort Worth, TX 76112 ("Manzana Grove").

Q. A commercial property located at 1330 East 300 North, Provo, UT 84606 ("Seven Peaks Water Park Provo").

R. A residential apartment complex located at 530 South 1200 West, Orem, UT 84058 ("Courtside Condominiums").

S.     A residential apartment complex located at 1019 Friendship Lane, Fredericksburg, TX (Highland Oaks").

T.     A residential apartment complex located at 1433 South 107th East, Tulsa, OK ("Sierra Pointe").

U.     The cabins, hotel, library building, and land located at Allberry Drive 3762, Island Park 83429 ("Henry's Fork Heights").

V.     The office building located at 17-21 East Main Street, Rochester, NY 14614 ("17 East Main Office Building").

W.     The hotel located at 61 N Main St, Fillmore, UT 84631-4507 ("Fillmore Hotel").

### III.  <u>GROUNDS FOR RELIEF</u>

Plaintiffs are the leaseholder for the Leased Properties, and the Conte-Hansen Enterprise cannot abridge Plaintiffs' right to control the Leased Properties without following the proper legal proceedings, which it has not.

Plaintiffs are the owner of the Owned Properties, and the Conte-Hansen Enterprise has no leasehold interest in the Owned Properties because there are no leases or rent payments on the owned properties. The Conte-Hansen Enterprise therefore has no possessory interest in the Owned Properties, and to the extent that the Conte-Hansen Enterprise holds the mortgage on any of the properties, the Conte-Hansen Enterprise cannot thereby abridge Plaintiffs' right to control the Owned Properties without following the proper legal proceedings, which it has not.

Since the Conte-Hansen Enterprise and its agents have been informed by Plaintiffs via Cease and Desist Letters that they are no longer allowed on the Properties, their repeated and continuing presence at the Properties and assertion of control over the Properties represents a repeated and continuing trespass and should be enjoined by this Court.

Specifically, the repeated and continuing trespasses on the Properties cause irreparable harm because the only possible legal remedy would be via a multiplicity of suits. In addition, the harm caused by the trespasses outweighs whatever harm would be caused by enjoining the trespasses, since the Conte-Hansen Enterprise is trespassing in violation of the law and of Plaintiffs' possessory rights in the Properties. Also, the public interest is best served by the enforcement of property rights. Finally, as demonstrated by the documents attached hereto, Plaintiffs are the owners or leaseholders on each of the Properties, and there are no contrary rights to possession held by the Conte-Hansen Agents.

## IV.   STATEMENT OF FACTS

1.     Plaintiff Gary R. Brinton owns certain entities including ZIBALSTAR, L.C., a Utah Limited Liability Company; BRIGHTON PLACE, L.C., a Utah Limited Liability Company; TMBRS PROPERTY HOLDINGS, LLC, a Utah Limited Liability Company; SEVEN PEAKS WATERPARK PROVO, INC., a Utah Corporation; 1481 DEWEY NY LLC, a New York Limited Liability Company; JUNCTION MARKET ALPINE, L.C., a Utah Limited Liability Company; HENRY'S FORK HEIGHTS, L.C., a Utah Limited Liability Company; DERBYSHIRE HOLDINGS, LLC, an Oklahoma Limited Liability Company Registered to do Business in Utah; JUNCTION MARKET FAIRVIEW, L.C., a Utah Limited Liability Company; JUNCTION MARKET SCIPIO, L.C., a Utah Limited Liability Company; JUNCTION MARKET ISLAND PARK, L.C., a Utah Limited Liability Company; JUNCTION MARKET SPRINGDALE, L.C., a Utah Limited Liability Company; BLUE HOUSE FILLMORE, L.C., a Utah Limited Liability Company; WINCHESTER BUSINESS PARK, L.C., a Utah Limited Liability Company; and REDWOOD HOLDINGS, L.C., a Utah Limited Liability Company

("Brinton Entities" or "Plaintiff Entities"). (Declaration of Gary R. Brinton ("G. Brinton Dec.") ¶ 2.)

2.      Brinton holds title or owns a leasehold interest in each of the Properties via his ownership and control of the Plaintiff Entities. (G. Brinton Dec. ¶ 2.)

**Leased Properties**

3.      A Brinton entity has 51% voting control over TMBRS Property Holdings, LLC ("TMBRS PH"). (Unanimous Written Action of the Members of TMBRS Property Holdings, LLC (November 22, 2016) ("TMBRS Action"), attached hereto as "Exhibit 1".)

4.      TMBRS PH leases The Cove and Bradford Townhomes from Robert Conte and/or his Entity(ies) ("Conte"). (Master Lease with Option to Purchase (March 1, 2015) ("Cove/Bradford Lease"), attached hereto as "Exhibit 2".)

5.      There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Cove/Bradford Lease. (G. Brinton Dec. ¶ 5.)

6.      TMBRS PH leases Southern Oaks, Whispering Oaks, and McKinley Court from Conte. (Master Lease with Option to Purchase (March 1, 2015) ("Southern/Whispering/McKinley Lease"), attached hereto as "Exhibit 3".)

7.      Brinton exercised the option to purchase Southern Oaks. There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Southern/Whispering/McKinley Lease. (G. Brinton Dec. ¶ 7.)

8.      TMBRS PH leases Tres Palms, Silverwood, and Four Oaks from Conte. (Master Lease with Option to Purchase (March 1, 2015) ("Tres Palms/Silverwood/Four Oaks Lease"), attached hereto as "Exhibit 4".)

9.      There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Tres Palms/Silverwood/Four Oaks Lease. (G. Brinton Dec. ¶ 9.)

10.     A Brinton entity leases San Jacinto from Conte.   (Master Lease 880 Jackpot Avenue, Jackpot, Nevada (August 1, 2016) ("San Jacinto Lease"), attached hereto as "Exhibit 5".)

11.     There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the San Jacinto Lease. (G. Brinton Dec. ¶ 11.)

12.     A Brinton entity leases Manzana Grove from Conte.   (Manzana Grove Master Lease with Option to Purchase (July 27, 2016) ("Manzana Grove Lease"), attached hereto as "Exhibit 6".)

13.     There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Manzana Grove Lease. (G. Brinton Dec. ¶ 13.)

14.     A Brinton entity leases Seven Peaks Waterpark Provo from Conte.   (Absolute Triple Net Lease with Option to Purchase Seven Peaks Waterpark Provo (September 1, 2016) ("Seven Peaks Lease"), attached hereto as "Exhibit 7".)

15.     There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Seven Peaks Lease. (G. Brinton Dec. ¶ 15.)

16.     A Brinton entity leases Courtside Condominiums from Conte.   (Absolute Triple Net Lease Courtside Condominiums (October 5, 2016) ("Courtside Lease"), attached hereto as "Exhibit 8".)

17.     There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Courtside Lease. (G. Brinton Dec. ¶ 17.)

18.     A Brinton entity leases Highland Oaks from Conte.   (Highland Oaks Master Lease with Option to Purchase (July 27, 2016) ("Highland Oaks Lease"), attached hereto as "Exhibit 9".)

19.     There are no suits or other court proceedings that have resulted in a loss of these possessory rights under the Highland Oaks Lease. (G. Brinton Dec. ¶ 19.)

**<u>Owned Properties</u>**

20.     A Brinton entity owns the Alpine Gas Station. (Warranty Deed for Alpine Station (March 15, 2017) ("Alpine Deed"), attached hereto as "Exhibit 10".)

21.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Alpine Deed. (G. Brinton Dec. ¶ 21.)

22.     A Brinton entity owns the Sierra Pointe apartments. (Warranty Deed for Sierra Pointe Apartments (March 15, 2017) ("Sierra Deed"), attached hereto as "Exhibit 11".)

23.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Sierra Deed. (G. Brinton Dec. ¶ 23.)

24.     A Brinton entity owns the Henry's Fork Heights cabins, hotel, and library building. (Warranty Deed for Henry's Fork Heights (January 4, 2017) ("Henry's Fork Deed"), attached hereto as "Exhibit 12".)

25.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Henry's Fork Deed. (G. Brinton Dec. ¶ 25.)

26.     A Brinton entity owns the Fairview Gas Station. (Warranty Deed for Fairview Gas Station (November 30, 2016) ("Fairview Deed"), attached hereto as "Exhibit 13".)

27.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Fairview Deed. (G. Brinton Dec. ¶ 27.)

28.     A Brinton entity owns the Panguitch Gas Station. (Quit-claim Deed for Panguitch Gas Station (November 29, 2016) ("Panguitch Deed"), attached hereto as "Exhibit 14".)

29.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Panguitch Deed. (G. Brinton Dec. ¶ 29.)

30.     A Brinton entity owns the Scipio Gas Station. (Warranty Deed for Scipio Gas Station (March 15, 2017) ("Scipio Deed"), attached hereto as "Exhibit 15".)

31.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Scipio Deed. (G. Brinton Dec. ¶ 31.)

32.     A Brinton entity owns the Springdale Gas Station. (Warranty Deed for Springdale Gas Station (March 15, 2017) ("Springdale Deed"), attached hereto as "Exhibit 16".)

33.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Springdale Deed. (G. Brinton Dec. ¶ 33.)

34.     A Brinton entity owns the Island Park Gas Station. (Special Warranty Deed for Island Park Gas Station (November 9, 2016) ("Island Park Deed"), attached hereto as "Exhibit 17".)

35.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Island Park Deed. (G. Brinton Dec. ¶ 35.)

36.     A Brinton entity owns the 17 East Main Office Building. (Warranty Deed for 17 East Main (November 3, 2016) ("17 East Main Deed"), attached hereto as "Exhibit 18".)

37.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the 17 East Main Deed. (G. Brinton Dec. ¶ 37.)

38.     A Brinton entity owns the Henry's Fork Heights Strip of Land. (Warranty Deed for Henry's Fork Heights Strip of Land (December 5, 2016) ("Henry's Fork Heights Strip of Land Deed"), attached hereto as "Exhibit 19".)

39.     There are no suits or other court proceedings that have resulted in a loss of Brinton's possessory rights under the Henry's Fork Heights Strip of Land Deed. (G. Brinton Dec. ¶ 39.)

**Conte-Hansen Agents Trespass/Assert Control in Derogation of Brinton's Property Rights**

40.     Plaintiffs originally consented to have Ted Hansen and the Conte-Hansen Agents manage the Properties on their behalf. (G. Brinton Dec. ¶ 40.)

41.     Plaintiffs eventually discovered that the Conte-Hansen Agents had seriously mismanaged the Properties on behalf of Plaintiffs, such that payments required under the leases and/or lending arrangements for the Properties were not being made. (G. Brinton Dec. 41.)

42.     As a result, Plaintiffs sent cease and desist letters on May 30, 2017, to the Conte-Hansen Agents, including individual letters addressed to Ted Hansen, Branden Hansen, Jeff Munoz, and David Turner, instructing them not to trespass on the premises of the Properties. (Letters Re: Directive to Cease and Desist (May 30, 2017) ("Cease and Desist Letters"), attached hereto as "Exhibit 20" through "Exhibit 25"; *see also* G. Brinton Dec. ¶ 42.)

43.     The Conte-Hansen Agents ignored the cease and desist letters in many instances and instead asserted control and dominion over the Properties in derogation of Plaintiffs' rights therein. (G. Brinton Dec. ¶ 43.)

44.     Plaintiffs also filed an action in Utah state court against some of the Defendants for damages caused by specific instances of their mismanagement of the Properties. (G. Brinton Dec. ¶ 44.)

**Conte-Hansen Agents Convert Inventory at the Gas Station Properties**

45.     For example, on May 31, 2017, Gary Brinton and agents of Plaintiffs went to the Alpine Gas Station; Conte-Hansen Agents were already there, and refused to leave the property when asked to do so by Plaintiffs, even after a clear explanation of Plaintiffs' property rights based on holding title to the property under the Alpine Deed. (G. Brinton Dec. ¶ 45.)

46.     The police were called, and Brinton explained to the police that he was the rightful owner of the property. (G. Brinton Dec. ¶ 46.)

47.     The Conte-Hansen Agents (including at least one attorney) spoke with the police and communicated to them that they had been "operating a business" for some time on the property. (G. Brinton Dec. ¶ 47.)

48.     The police told Brinton that they had concluded that because the Conte-Hansen Agents had been "operating a business" on the property for some time, the dispute was a civil matter and the police could not remove the Conte-Hansen Agents from the property without a court order. (G. Brinton Dec. ¶ 48.)

49.     Brinton and others witnessed the Conte-Hansen Agents selling gasoline and other inventory at the property by using credit card readers other than the normal readers at the station, such that the funds would be diverted to a different account than normal.  (G. Brinton Dec. ¶ 49.)

50.     The gasoline and other inventory at the station were purchased using funds belonging to Brinton; for example, when the Conte-Hansen Agents managing the gas station needed to pay the vendors who supplied the gasoline and other inventory, the vendors required that the money be paid out of a Brinton Entity account using a cashier's check because they did not trust payment from the Conte-Hansen Agents via other methods. (G. Brinton Dec. ¶ 50.)

51.     Brinton went to the Fairview, Scipio, Panguitch, and Springdale Gas Stations on Tuesday, June 6, and offered notice to the Conte-Hansen Agents operating these stations that he was the property owner and that they should quit the premises. (G. Brinton Dec. ¶¶ 51–58, 59–66, 70–80, 81–88.)

52.     The Conte-Hansen Agents operating the stations told him that under counsel from their supervisors they would not leave without a court order. (G. Brinton Dec. ¶¶ 58, 66, 80, 88.)

53.     Brinton also went to the Fillmore Hotel on Tuesday, June 6, and offered notice to the Conte-Hansen Agents operating the hotel that he was the property owner and that they should quit the premises. (G. Brinton Dec. ¶¶ 67–69.)

54.     The Conte-Hansen Agents operating the hotel told him that under counsel from their supervisors they would not leave without a court order. (G. Brinton Dec. ¶ 69.)

### Conte-Hansen Agents Destroy Property and Fixtures at the Residential Properties

55.     On the morning of Wednesday, May 31, 2017, Conte-Hansen Agents went to Sierra Pointe Apartments and started to pull equipment out of a storage shed. (Declaration of Andrew P. Nielson ("A. Nielson Dec.") ¶ 4.)

56.     The police were called and they instructed the Conte-Hansen Agents they would have to return with serial numbers of the equipment or other proof of purchase in order to prove that it belonged to them. (A. Nielson Dec. ¶ 5.)

57.     Shortly thereafter, the same Conte-Hansen Agents went across town to the Cove Apartments. (A. Nielson Dec. ¶ 6.)

58.     Plaintiffs' agents were in the downstairs office with security, but the Conte-Hansen Agents went into the upstairs office and stole computer monitors, equipment, papers, and files. (A. Nielson Dec. ¶ 7.)

59.     That evening, the sheds at the Sierra Point Apartments were broken into and all of the equipment that had been at issue during the day was taken. (A. Nielson Dec. ¶ 8.)

60.     On the evening of Saturday, June 3, 2017, someone tried to break into the Sierra Pointe storage sheds with a crow bar and failed. (A. Nielson Dec. ¶ 9.)

61.     On the evening of Sunday, June 4, 2017, someone broke a window at a Sierra Pointe storage area, entered the storage area thereby, spread paint around on the walls and floors, and damaged or destroyed many of the pipes on the back of the laundry machines. (A. Nielson Dec. ¶ 10.)

## Conte-Hansen Enterprise Capitalizes on Defaults

62.     On June 1, 2017, Branden Hansen sent letters to Plaintiffs informing them of default under the loan obligations connected to the ownership of three of the Gas Station Properties and demanding immediate possession of the same under the Trust Deeds associated with these Properties. (Email from Branden Hansen to Gary Brinton and attachments (June 2, 2017) ("Default Email"), attached hereto as "Exhibit 26"; *see also* G. Brinton Dec. ¶ 89.)

63.     As a result of the mismanagement of the Properties by the Conte-Hansen Agents, Plaintiffs are in imminent danger of losing their rights to the Properties under their respective leases and deeds back to the Conte-Hansen Enterprise. (G. Brinton Dec. ¶ 90.)

## V.  ARGUMENT

## I.  PLAINTIFFS ARE ENTITLED TO AN EX PARTE TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS AND THEIR AGENTS.

Federal Rule of Civil Procedure 65 authorizes a federal court to issue injunctive relief, including a temporary restraining order and a preliminary injunction. A temporary restraining order may provide for immediate ex parte relief if (1) the plaintiff establishes that immediate injury, loss, or damage will result to the plaintiff before the defendant can be heard in opposition;

and (2) the plaintiff's attorney certifies to the Court any efforts that have been made to give notice and why it should not be required. Fed. R. Civ. P. 65(b)(1). Plaintiffs establish both of these elements.

First, as discussed in detail below, Plaintiffs are suffering immediate and irreparable harm from the Conte-Hansen Enterprise's violation of Plaintiffs' property rights and the associated conversion and destruction of Plaintiffs' Properties and the personal property thereon. Not only are the Conte-Hansen Agents trespassing on Plaintiffs' properties in a repeated and continuous manner, but they are also selling inventory paid for by Plaintiffs from the Gas Station Properties and keeping the proceeds (*see, e.g.*, G. Brinton Dec. ¶ 50), as well as damaging, destroying, and stealing fixtures and equipment on the Residential Properties, (*see* A. Nielson Dec. ¶¶ 4–10.)

Second, Plaintiffs and their counsel have sent several notices to the Conte-Hansen Agents demanding that they cease and desist from trespassing on the Properties and threatening this legal action otherwise. (*See* Exs. 20–25.) These notices provide sufficient notice of the issues related to Plaintiffs' causes of action. In addition, not only have these notices failed to cause the Conte-Hansen Agents to cease and desist from their actions, but the Conte-Hansen Agents have escalated their actions of trespass, conversion, and destruction on Plaintiffs' Properties since notice was given. (*See, e.g.*, A. Nielson Dec. ¶¶ 4–10.) In light of their response thus far, it is clear that further notice would only provoke further escalation by the Conte-Hansen Agents prior to relief from this Court, so any further notice should not be required.

Thus, an *ex parte* temporary restraining order should immediately issue.

## II. THE PLAINTIFFS SATISFY ALL THE CRITERIA FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

A party moving for a preliminary injunction to preserve the status quo pending the outcome of the case must show the following:

(1)   the moving party will suffer irreparable injury unless the injunction issues;
(2)   the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party;
(3)   the injunction, if issued, would not be adverse to the public interest; and
(4)   there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).    The standard for a temporary restraining order is the same as a preliminary injunction. *Bachman By and through Bachman v. W. High Sch.*, 900 F.Supp. 248, 250 (D.Utah 1995) *aff'd* 132 F.3d 542 (10th Cir.1997).

Although "[i]t is the movant's burden to establish that each of these factors tips in his or her favor," as long as "the moving party has established that the three 'harm' factors [(1), (2), and (3)] tip decidedly in its favor, the [fourth] 'probability of success requirement' [(4)] is somewhat relaxed." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (*quoting Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001)). In such cases, "the movant need only show 'questions going to the merits so serious, substantial, difficult, and doubtful to make them fair ground for litigation." *Heideman*, 348 F.3d at 1189.

### A.    Without Injunctive Relief, the Plaintiffs Will Be Irreparably Harmed.

Unless the Conti-Hansen Enterprise and its Agents are ordered not to trespass on the Properties, the Plaintiffs will be irreparably harmed because a multiplicity of suits would be necessary to seek legal redress for the Conti-Hansen Agents repeated and continuous trespass. In addition, (2) the Conti-Hansen Agents' wrongs occasion damages that could be estimated only by conjecture, and not by any accurate standard; (3) the Conti-Hansen Agents' actions are a threat to the Plaintiffs' trade and jeopardize their viability; and (4) collecting a damage judgment

against the Conti-Hansen Agents will be impossible. The Plaintiffs satisfy the irreparable harm standard for a temporary restraining order and a preliminary injunction.

> **i.   The repeated and continued trespass by the Conte-Hansen Agents constitutes irreparable harm because a multiplicity of suits would be necessary to secure a legal remedy.**

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S. Ct. 948, 954, 3 L. Ed. 2d 988 (1959). This requirement is met when a multiplicity of suits would be required to obtain a full legal remedy. *See, e.g.*, *Lee v. Bickell*, 292 U.S. 415, 421, 54 S. Ct. 727, 730, 78 L. Ed. 1337 (1934) ("the multiplicity of actions necessary for redress at law being sufficient, without reference to other considerations, to uphold the remedy by injunction."). Although the Plaintiffs have a legal cause of action for the trespasses being committed by the Conte-Hansen Agents, repeated suits would be necessary for a full legal remedy, so that option is impracticable and inefficient. *See* 42 Am. Jur. 2d Injunctions § 39 ("It is not meant . . . that the mere existence of an available legal remedy will defeat the right to injunction, for to have that effect the legal remedy must be as practicable and efficient toward the ends of justice as an injunction."). As a result, injunctive relief is appropriate to stop repeated or continuous trespass. *See generally* 1 Dan B. Dobbs, et al., *The Law of Torts* § 56 (2d ed. 2011) ("Courts will issue injunctions to prevent trespasses that threaten to continue or to be repeated."); 8 Richard R. Powell, Powell on Real Property § P6.07[5][b] (2015) ("The nature of the tort of trespass indicates that it may be continuous or repeated or threatened to be repeated. Injunctive relief is appropriate in any of these cases.").

Binding authority in this circuit specifically recognizes the principle that continued or repeated trespass creates irreparable harm "because a multiplicity of suits for damages is never

an adequate remedy for the loss which constantly repeated trespasses entail." *Stearns-Roger Mfg.
Co. v. Brown*, 114 F. 939, 945 (8th Cir.[1] 1902); *see also Dimick v. Shaw*, 94 F. 266, 268 (8th Cir.
1899) ("A continuing trespass upon real estate, or upon an interest therein, to the serious damage
of the complainant, warrants an injunction to restrain it. A suit in equity is generally the only
adequate remedy for trespasses continually repeated, because constantly recurring actions for
damages would be more vexatious and expensive than effective."). Other courts that have
considered continued or repeated trespass have likewise concluded that the irreparable harm
standard is met and an injunction is justified in such cases. *See United States v. Zenon*, 711 F.2d
476, 478 (1st Cir. 1983) ("A court has power to enjoin a trespass if it would cause irreparable
injury, or if there are repeated instances of trespassing, and a single injunction might forestall a
'multiplicity' of legal actions."); *United States v. Colvard*, 89 F.2d 312, 314 (4th Cir. 1937) ("it
is, of course, well settled that injunctive relief is proper against continuing trespass or against
repeated trespasses where there is threat of continuance and the remedy at law is inadequate or
multiplicity of suits would be avoided by the equitable remedy."); *Swan Island Club v. Ansell*, 51
F.2d 337, 339 (4th Cir. 1931) ("it is thoroughly well established that equity does have
jurisdiction to restrain repeated and continuing trespasses"); *The Salton Sea Cases*, 172 F. 792,
800 (9th Cir. 1909) ("A continuing trespass upon real estate or upon an interest therein, to the
serious damage of the complainant, warrants an injunction to restrain it. A suit in equity is

---

[1] The Tenth Circuit has recognized the binding effect of the decisions of the Eighth Circuit prior
to the 1929 Act that created the Tenth Circuit out of the Eighth Circuit. *See Boynton v. Moffat
Tunnel Improvement Dist.*, 57 F.2d 772, 781 (10th Cir. 1932) (Tenth Circuit stated that
"decisions . . . from the Eighth Circuit Court of Appeals . . . are binding upon us.")

generally the only adequate remedy for trespasses continually repeated, because constantly reoccurring actions for damages would be more vexatious and expensive than effective.").[2]

Utah state courts have gone so far as to hold that the harm presumed from a trespass under Utah law forms an appropriate ground for injunctive relief independent of whether the trespass is repeated or continuous. *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 33, 364 P.3d 1013, 1020, ("property . . .  rights are protected by a legal presumption of harm. Thus, a trespass on a right of property is actionable upon any physical invasion of it, regardless of whether the invasion causes measurable damage. The presumption of harm flows from the very nature of a property right, which at its core is a right to exclude others. With this in mind, the law presumes that the infringement of a property right is harmful, and sustains a remedy of an injunction to vindicate that right and prevent future harm."); *see also John Price Assocs., Inc. v. Utah State*

---

[2] *See also Gaulter v. Capdeboscq*, 404 F. Supp. 900, 904 (E.D. La. 1975) (enjoining "the defendants . . . and all persons acting in concert with them or under their instructions, from trespassing on or destroying plaintiff's property" until a final adjudication including of the ownership of the property); *Potomac Elec. Power Co. v. Washington Chapter of Cong. of Racial Equal.*, 210 F. Supp. 418, 420 (D.D.C 1962) ("If the trespass is continuous in its nature, if repeated acts of wrong are done or threatened, although each of these acts, taken by itself, may not be destructive, and the legal remedy may therefore be adequate for each single act if it stood alone, then also the entire wrong will be prevented or stopped by injunction, on the ground of avoiding a repetition of similar actions" (citations, quotation marks omitted); *Miracle v. Jacoby*, 192 F. Supp. 907, 911 (W.D. Ark. 1961) ("The general rule permits injunctive relief for repeated or continuing trespasses, even in cases where the damage is nominal and no single trespass causes irreparable injury." (citations, quotation marks omitted)); *accord, e.g., Aberdeen Apartments v. Cary Campbell Realty All., Inc.*, 820 N.E.2d 158, 168 (Ind. Ct. App. 2005) ("Campbell Realty's delivery teams enter the Apartments' properties on a weekly basis. This constitutes a continuing trespass. A trial court may issue an injunction in order to prevent a continued trespass." (internal quotation marks omitted)); *Reprod. Health Servs. v. Lee*, 712 S.W.2d 718, 720 (Mo. Ct. App. 1986) ("It has been held that where a trespass is recurring and would involve a multiplicity of suits an injunction will lie to restrain it. In such a case there is no adequate remedy at law, and plaintiff need not show irreparable harm. Furthermore, the threat of future trespasses may be inferred from the frequency and pattern of defendant's entry upon plaintiffs' property." (internal citations, quotation marks omitted)).

*Conference, Bricklayers Locals Nos. 1,2 & 6 & Tile Setters Local No. 5*, 615 P.2d 1210, 1214 (Utah 1980) ("the state court may apply its trespass laws and enjoin the activity."). In this case, where the trespass is not only repeated and continuous but also accompanied by destruction of personal property and fixtures on the Properties, the Plaintiffs have suffered irreparable harm.

Thus, since Plaintiffs can only get a legal remedy for the trespasses and associated damages by the Conti-Hansen Agents via a series of suits for trespass, the irreparable harm standard is met here and injunctive relief is appropriate.

> **ii. The harms inflicted by the Conte-Hansen Agents' trespassing are irreparable because collecting a damage judgment will be difficult or impossible.**

In addition, given Ted Hansen's apparent insolvency and the mismanagement of funds from the Properties by the Conte-Hansen Enterprise, the harms being committed by the Conte-Hansen Agents may not even be remediable by a multiplicity of suits. In *Tri-State*, the Tenth Circuit noted that the plaintiff met the irreparable harm standard in part because the plaintiff would "have difficulty collecting a judgment[,] [since] [d]ifficulty in collecting a damage judgment may support a claim of irreparable injury." 805 F.2d at 355; *see also Central States, Southeast & Southwest Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.*, 511 F. Supp. 38, 43 (D. Minn. 1980) (injury may be irreparable if defendants will be financially unable to pay damages), *aff'd per curiam sub nom. Central States, Southeast & Southwest Areas Pension Fund v. Jack Cole-Dixie Highway Co.*, 642 F.2d 1122 (8th Cir.1981); *Philipp Brothers Division of Engelhard Minerals & Chemicals Corp. v. El Salto, S.A.*, 487 F. Supp. 91, 95 (S.D.N.Y.1980) (difficulty in collecting money judgment may support claim of irreparable harm).

Ted Hansen and his entities and agents manage—and in some cases mismanage—other people's money and assets, they do not have their own assets.  For example, in an admission against interest, Ted Hansen informed Gary Brinton that, to avoid creditors, he keeps no assets in his name. (G. Brinton Dec. ¶ 91.) And when Ted Hansen pled guilty to two counts of fraud last year, he agreed to terms of probation requiring him to inform potential investors in writing that he had over $45 Million in judgments against him, including over $2.5 Million in debt collection judgments.[3] (Statement of Defendant in Support of Guilty Plea, *State v. Theodore Hansen* (January 11, 2016) ("Hansen Guilty Plea"),[4] attached hereto as "Exhibit 27"; G. Brinton Dec. ¶ 92.) Since the plaintiff need not prove the future course of events to obtain an injunction, but instead only needs to show that the "possible course of events" leading to case conclusion could result in irreparable harm, 805 F.2d at 355, the fact that the Conte-Hansen Agents are unlikely to be able to pay a money judgment for their trespass harms meets the standard for irreparable harm.

### iii. The Conte-Hansen Agents' actions constitute irreparable harm because they threaten Plaintiffs' trade and jeopardize their viability.

The *Tri-State* court held that a Plaintiff would suffer irreparable harm if the defendant were not enjoined from actions that would "jeopardize" the plaintiff's "viability."  805 F.2d at 356 ("As a result of this 'domino effect,' Tri-State would be unable to repay its debts . . . , would

---

[3] Ted Hansen did not inform Brinton of these judgments, as required under Hansen's terms of probation. (G. Brinton Dec. ¶ 93.)
[4] Plaintiffs request that this court take judicial notice of this publicly-filed court record, since the range of facts subject to judicial notice includes another court's "publicly filed records . . . concerning matters that bear directly upon the disposition of the case at hand." *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007); *see also St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

be forced into bankruptcy, and would likely collapse."). A threat to trade or business viability may constitute irreparable harm.  *See, e.g.*, *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28–29 (2d Cir.1978) (possibility of going out of business is irreparable harm),; *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (loss of right to continue business may support claim of irreparable injury). The threat of a plaintiff's demise while pursuing a non-collectable judgment is therefore sufficient to show irreparable injury:

> If the preliminary injunction does not issue, Tri-State has no protection against the loss of its business while the litigation progresses. Rather, it would perhaps be left after a trial on the merits with an empty victory.  Shoshone may be found to have breached its contract with Tri-State, but in the meantime Tri-State would have ceased to exist. Tri-State has adequately shown that without the preliminary injunction, it will suffer irreparable harm.

*Tri-State*, 805 F.2d at 356; *see also Potomac Elec. Power Co. v. Washington Chapter of Cong. of Racial Equal.*, 210 F. Supp. 418, 419 (D.D.C 1962) ("It is well established that equity may enjoin continuing trespasses, repeated or irreparable injuries to property, or a course of illegitimate interference with business activities, if a remedy by an action for damages is not adequate.")

Because of the conduct of the Conte-Hansen Agents, the Plaintiffs could lose their trade and viability. For example, despite receiving $1.1 million to $1.3 million in monthly revenues from the Properties, the Conte-Hansen Agents that had been managing the Properties failed to make mortgage and loan payments, placing certain Plaintiffs in default and threatening their loss of properties.  (G. Brinton Dec. ¶ 90.) And the Conte-Hansen Agents' destruction and conversion of property has escalated as Plaintiffs have demanded that they cease and desist from trespassing on the Properties. (A. Nielson Dec. ¶¶ 9–10.) Injunctive relief is necessary to prevent the Conte-

Hansen Agents' perpetration of these wrongs and to compel the cessation of their continuing misconduct.

Thus, Plaintiffs amply meet the irreparable harm requirement.

### B. The Threatened Injury to the Applicant Outweighs Whatever Damage Injunctions May Cause the Defendants.

To receive injunctive relief, Plaintiffs must also demonstrate that the injury to them outweighs any damage the restraining order may cause the defendants.

Plaintiffs have terminated the Conte-Hansen Agents' management services, but the Conte-Hansen Agents refuse to cease and desist from their conversion and depletion of Plaintiffs' resources, which will lead to the loss of Plaintiffs' properties, assets, businesses, employees and goodwill if continued, and could subject Plaintiffs to liability. (G. Brinton Dec. ¶ 94.) The Conte-Hansen Agents, on the other hand, have no possessory interest rights in the properties and/or assets they are wasting and thus no legal right to waste them.

Preservation of the status quo—namely, the parties' actual relationship prior to the conflict, under which Plaintiffs' control over the Properties was undisputed and the Conte-Hansen Agents were allowed onto the Properties at Plaintiffs' behest, just like any other licensee—is necessary to prevent Plaintiffs' economic destruction, which far outweighs any harm that will come to the Conte-Hansen Agents from being forced to cease unlawful conduct. Plaintiffs' harm is comparable to a homeowners' danger from not being allowed to protect his home against theft, whereas the defendants' harm is comparable to the denial of a non-owner's desire to strip the home and fence the loot. The defendants cannot be heard to complain of harm because they have no right to continue breaking the law.

For example, in *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1498 (10th Cir. 1993) *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011), the district judge rejected an intellectual property infringer's claim that the injunction would "devastate" its business, holding that, even assuming devastation, a wrongdoer cannot be permitted to construct its business around its wrongdoing. The Tenth Circuit affirmed, holding that the harm from being forced to stop unlawful conduct "merits little equitable consideration and is insufficient to outweigh the continued [wrongdoing]," because "placing too much weight on this factor would reward" wrongdoers. *Id.* (internal citations, quotation marks omitted).[5] As a result, Plaintiffs have shown that the balance of harms weighs in their favor.

### C.     Injunctive Relief Would Support the Public Interest.

To the extent that the public interest factor applies to this Motion, it weighs in favor of injunctive relief. Allowing a defendant to continue violating the law is never in the public interest, whereas the enforcement of an owner or leaseholder's property rights is in the public interest. *See, e.g., Manheim Remarketing, Inc. v. J & B Auto Sales & Brokerage, LLC*, Case No. 12-60609-CIV, 2012 WL 12873223, at *4 (S.D. Fla. Apr. 13, 2012) ("the potential hardship that a temporary restraining will impose on the Defendants in light of the indication in the record that

---

[5] This case is also similar to *Novell Inc. v. Timpanogos Research Grp. Inc.*, Case No. 970400339, 1998 WL 177721, at *25 (Utah Dist. Ct. Jan. 30, 1998), in which the court held that "where defendants have no legal claim to Novell's technologies and proprietary information, they are hard pressed to claim that they should be permitted to use that which they unlawfully took from Novell. Because they do not have a legal basis to use Novell's confidential information, the threat to Novell if defendants use this information and technology clearly outweighs any risk to defendants." *Id.* at *25. As in *Novell*, the Conte-Hansen Agents would be "hard pressed" to claim they should be able to continue to pillage Plaintiffs' property. *Id.*

the Defendants have no rights of possession"; in contrast, "the defense and preservation of [Plaintiff's] property rights and security interest is in the public interest, as it supports the enforcement of valid contracts and property rights"); *Gustafson v. Poitra*, Case No. 4:12-CV-129, 2012 WL 4755410, at *3 (D.N.D. Oct. 5, 2012) (Plaintiffs had shown "needless interference with property rights and interference with an ongoing business," and "[t]he public interest weighs in favor of protecting against such activity."). Thus, Plaintiffs satisfy the public interest requirement for injunctive relief.

### D. There Is a Substantial Likelihood that the Applicant Will Prevail on the Merits of the Underlying Claim, or the Case Presents Serious Issues on the Merits Which Should Be the Subject of Further Litigation.

Finally, there is more than a substantial likelihood that Plaintiffs will prevail on the merits of the underlying trespass claim. At the outset, it is worth noting that the Tenth Circuit has adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981). Regardless of the standard, the documents attached hereto show that by ignoring Plaintiffs' instructions to leave the Properties and not return, the Conte-Hansen Agents have committed trespass in violation of Plaintiffs' property rights. Plaintiffs have a clear right to possess the Properties and exclude others (including the Conte-Hansen Agents) therefrom.

In general, the elements of trespass have been described as follows: "(1) ownership or a possessory interest in the property; (2) that the defendant entered on or caused some thing to

enter on the property; (3) that the defendant's entry was without permission or consent; and (4) that the defendant's entry was intentional or voluntary." 61 Causes of Action 2d 467 (2014).[6]

With regard to the first element, Plaintiffs have demonstrated via the attached documents that they hold title to the Owned Properties and they have the leasehold interest in the Leased Properties. (*See* Facts ¶¶ 2–39.)

With regard to the second element, the Conte-Hansen Agents have not only entered the Properties, they have remained on the Properties and even asserted control and dominion over the Properties in contravention of Plaintiffs' lawful rights to possess and control the Properties.

With regard to the third element, although the Conte-Hansen Agents were originally invited by Plaintiffs to enter the Properties in order to manage them for Plaintiffs, Plaintiffs subsequently concluded that the Conte-Hansen Agents were mismanaging the Properties and terminated their services. Since Plaintiffs have clearly disinvited the Conte-Hansen Agents from the Properties, their continued presence on the Properties is without permission or consent.

With regard to the fourth element, it is inconceivable that the Conte-Hansen Agents took over the Properties unintentionally or involuntarily.

Thus, all four elements of trespass have been met here.

Indeed, in the interactions with the Conte-Hansen Agents that have occurred since Plaintiffs gave them notice to cease and desist coming on to the Properties, the Conte-Hansen Agents have not disputed any of the above elements. Instead, they have asserted various arguments that are baseless or unsound. For example, at the Alpine Gas Station the Conte-

---

[6] Under Utah law, "[t]he essential element of trespass is physical invasion of the land." *Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1243 (Utah 1998). Plaintiffs have shown that the Conte-Hansen Agents have physically invaded the Properties in a continuous and repeated manner, and have converted and destroyed personal property thereon.

Hansen Agents convinced the police not to remove them from the Property as trespassers based on the fact that they had been "operating a business" at that location for some time, at which point the police concluded the matter was a civil dispute for a judge to resolve. (G. Brinton Dec. ¶¶ 48–49.) However, the assertion about "operating a business" erroneously implies that there was some sort of landlord-tenant relationship between the Conte-Hansen Agents at the Alpine Gas Station giving rise to a possessory interest for the Conte-Hansen Agents, as under a commercial lease.   On the contrary, there was no lease entered into between Plaintiffs and the Conte-Hansen Agents following Plaintiffs' acquisition of the properties, nor have any rent payments been made by the Conte-Hansen Agents. (G. Brinton Dec. ¶¶ 95–96.) Instead, the Conte-Hansen Agents were merely the managers initially chosen by Plaintiffs to manage the Properties, and when the Plaintiffs terminated this arrangement and disinvited the Conte-Hansen Agents from the Properties, no property right remained with the Conte-Hansen Agents to contradict Plaintiffs possessory interest in the Properties.[7]

Likewise, for three of the Gas Station Properties, Branden Hansen sent Plaintiffs a letter claiming immediate legal possession of the three Gas State Properties based on language in the Trust Deed for each Gas Station Property. (Ex. 26; G. Brinton Dec. ¶ 89.) However, there have been no foreclosure proceedings with regard to these three Gas Station Properties or any of the

---

[7] Indeed, even if the Conte-Hansen Agents had been given a right to reside in the Properties as part of their compensation (which they did not), that right would still have been rescinded immediately upon their termination as managers of the Properties. *See* 49 Am. Jur. 2d Landlord and Tenant § 10 ("If an employee, as a part of his or her compensation, occupies premises belonging to the employer, the employee has no right to continue occupation of the premises on the termination of his or her employment, in the absence of some right to that effect arising out of the terms of the contract by which the employee was given possession. In the absence of such a provision, the employer may take immediate possession and use such force as necessary to expel the employee.").

Properties, (G. Brinton Dec. ¶ 21, 31, 33), and language in a trust deed or mortgage cannot allow a lender to circumvent the statutory requirements of foreclosure and sale in order in the case of default under the associated obligation, *see, e.g.*, Utah Code §§ 57-1-23, -24, -27 (setting forth the procedures for the foreclosure and sale of a property upon default under a trust deed); *see also* Utah Code § 78B-6-1310 ("A mortgage of real property may not be considered a conveyance which would enable the owner of the mortgage to recover possession of the real property without a foreclosure and sale.").

Thus, Plaintiffs satisfy the fourth preliminary injunction prerequisite by showing there is a substantial likelihood that they will prevail on the merits of the underlying claim; at a minimum, the case presents serious issues on the merits that should be the subject of further litigation.

## III.   NO BOND IS NECESSARY, BECAUSE THE TERMINATED DEFENDANTS HAVE NO ONGOING PROTECTABLE PROPERTY OR OTHER INTEREST.

The Plaintiffs need not post a bond, because the Conte-Hansen Agents were merely the Property managers, not the owners or leaseholders of the Properties, and their services have been terminated. As discussed above, the Conte-Hansen Agents have no right to a continued presence on the Properties now that Plaintiffs have invited them to leave; on the contrary, their continued presence violates the law and Plaintiffs' property rights. In the absence any harm to the Conte-Hansen Agents, no bond is required under Rule 65. For example, in *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964), the Tenth Circuit upheld a district court's grant of injunctive relief without a bond, noting that "[t]he trial judge has wide discretion in the matter of requiring security and if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary."  The court went on to hold that no bond is necessary

where the movant "is a corporation with considerable assets and [the movant] is able to respond in damages if [the nonmovant] does suffer damages by reason of the injunction." *Id.* Since lawbreakers are not harmed by being enjoined from breaking the law, and Plaintiffs can respond to damages if needed anyway, Plaintiffs should not be required to post bond.

## VI.   <u>CONCLUSION</u>

Plaintiffs therefore respectfully request that this Court enter a temporary restraining order enjoining the Conte-Hansen Agents from trespassing on the Properties, as described in the Proposed Order, and that the Court set a hearing and grant a preliminary injunction as soon as reasonably possible.

DATED: June 12, 2017                     Respectfully submitted,


By: *Jedediah G. Brinton*
Jedediah G. Brinton (SBN: 14145)
Adam L. Hoyt (SBN: 13463)
Dustin N. Slade (Pro Hac Vice Pending)
PIA ANDERSON MOSS HOYT
136 E. South Temple, Suite 1900
Salt Lake City, Utah 84111
Telephone: 801-350-9000
Facsimile: 801-350-9010
Email: jbrinton@pamhlaw.com
          dslade@pamhlaw.com

ATTORNEYS FOR PLAINTIFFS